IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VIDEOSHARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-990 (GMS) |
| | ) | |
| GOOGLE, INC. and YOUTUBE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM

## I.     INTRODUCTION

On June 4, 2013, Plaintiff VideoShare, LLC ("VideoShare") initiated this patent infringement lawsuit against Google, Inc. and YouTube, LLC (collectively "Google"), alleging infringement of U.S. Patent No. 8,438,608 ("the '608 patent"). VideoShare amended its complaint on June 26, 2013, to also allege infringement of U.S. Patent No. 8,464,302 ("the '302 patent"). Presently before the court is Google's Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). (D.I. 84.) Google argues that the '608 and '302 patents are invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter. For the reasons discussed below, the court will grant Google's Motion.

## II.    BACKGROUND

The '608 patent describes a method and system for sharing streaming video over a network. Claim 1 is representative:[1]

---

[1] System claim 14 of the '608 patent merely recites general computer components for performing the same method steps recited in claim 1.

> 1. A method of streaming a video to users over a network, the method comprising the steps of:
> receiving, by a receiving computer via a web page, a video file sent by a user on a second computer on a network;
> executing, by the receiving computer, in response to receiving the video file, an automated function automatically performing each of:
> (b1) converting the video file into a streaming video file comprising a streaming video format, the video file being converted independent from receiving a command to perform such conversion from the user;
> (b2) generating an identification tag comprising a video frame image representing a subject matter of the streaming video file and identifying the streaming video file; and
> (b3) embedding the identification tag comprising the video frame image into a web page for serving the streaming video file to one or more users on one or more computers on the network.

'608 patent, claim 1.

The '302 patent similarly describes a method and system for sharing streaming video over a network, but additionally requires an associated advertisement. Claim 1 is representative:[2]

> 1. A method of sharing a streaming video and associated advertisement over a network, comprising:
> executing, by a first computer:
> receiving an advertisement;
> storing the advertisement;
> receiving a video file;
> converting the video file into a streaming video file comprising a streaming video format, independent from receiving a command to perform such conversion;
> storing the streaming video file to a storage device; generating an identification tag identifying the stored streaming video file;
> associating the streaming video file with the advertisement;
> embedding the identification tag into a web page accessible to a plurality of users on the network;
> receiving, via a web page, a request to transmit the streaming video file; and

---

[2] System claim 14 of the '302 patent merely recites general computer components for performing the same method steps recited in claim 1.

> transmitting, via a web page, the streaming video file and the
> advertisement to a second computer on the network.

'302 patent, claim 1.

Google argues that the '608 and '302 patents are invalid for claiming "the patent-ineligible abstract idea of translating (converting) content and sharing the translated content (such as video segments), with or without accompanying advertisements." (D.I. 85 at 1.)   Google further contends that there is no "inventive concept" under *Alice* step two because the patent claims "do nothing more than apply the abstract idea using conventional computers and Internet operations." (*Id.* at 2.)

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed—but early enough not to delay trial."  When evaluating a motion for judgment on the pleadings, the court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000).  A Rule 12(c) motion will not be granted "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau*, 539 F.3d at 221.  This is the same standard as a Rule 12(b)(6) motion to dismiss.  *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).  "The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that any documents integral to pleadings may be considered in connection with Rule 12(c) motion).  Moreover,

disposal of patent infringement cases based on the pleadings alone has been repeatedly sanctioned by the Federal Circuit when "claims are plainly directed to a patent-ineligible abstract idea." *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1364 (Fed. Cir. 2015) (Mayer, J., concurring).

Section 101 describes the general categories of patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. These broad classifications are limited, however, by exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2216 (2013)). Courts have eschewed bright line rules circumscribing the contours of these exceptions. *See id.* ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") (internal citation and quotations marks omitted). The Supreme Court's decision in *Alice* reaffirmed the framework first outlined in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), used to "distinguish[] patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *See Alice*, 134 S. Ct. at 2355.

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, what else is there in the claims before us? To answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application. We have described step two of this analysis as a search for an "inventive concept"—*i.e.*, an element or combination of elements that is

> sufficient to ensure that the patent in practice amounts to
> significantly more than a patent upon the ineligible concept itself.

*Id.* (internal citations, quotations marks, and alterations omitted). "[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S. Ct. at 2354. Thus, the court must determine (1) if the patented technology is directed to ineligible subject matter, and, if so, (2) whether there are sufficient inventive elements such that the invention is "'significantly more' than a patent on an ineligible concept." *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at 2355); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015); *OIP Techs.*, 788 F.3d at 1362.

## IV.    DISCUSSION

Judgment on the pleadings is proper because no material issue of fact remains to be resolved and Google is entitled to judgment as a matter of law.[3] VideoShare does not argue that issues of material fact remain, that the court would benefit from expert testimony, or that judgment on the pleadings at this stage is not procedurally proper.  Moreover, applying the two-step framework outlined in *Alice*, the court is persuaded by clear and convincing evidence that the '608 and '302 patents are invalid under 35 U.S.C. § 101 for claiming an abstract idea without reciting additional limitations that amount to something "significantly more" than the abstract concept itself. *See Alice*, 134 S. Ct. at 2355.

### 1.  <u>Step 1: Abstract Idea</u>

The first step of the § 101 analysis requires determining whether the claims are "directed to" an abstract idea. *DDR Holdings*, 773 F.3d at 1255. "The 'abstract ideas' category embodies

---

[3] The court addresses Google's motion with caution, cognizant of the gravity of dismissing a complex case at an early stage of litigation.

the longstanding rule that an idea of itself is not patentable." *Alice*, 134 S. Ct. at 2355 (internal

quotation marks omitted) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Although the

Supreme Court has not "delimit[ed] the precise contours of the 'abstract ideas' category," *Alice*,

132 S. Ct. at 2357, several decisions by the Supreme Court, reaffirmed in *Alice*, have provided

some guidance on patent-ineligible subject matter, *id*. at 2355–56. For example, the Supreme

Court has confirmed that without an inventive concept, claims covering algorithms, mathematical

formulas, and fundamental economic practices are patent-ineligible. *See Benson*, 409 U.S. at 71–

72 (finding patent-ineligible claims involving an algorithm for converting binary-coded decimal

numerals into pure binary that "in practical effect would be a patent on the algorithm itself");

*Parker v. Flook*, 437 U.S. 584, 594–95 (1978) (finding patent-ineligible a mathematical formula

for computing an alarm limit in a chemical process); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)

(finding patent-ineligible the concept of hedging, which is a "fundamental economic practice long

prevalent in our system of commerce"); *Alice*, 134 S. Ct. at 2356 (finding patent-ineligible the

concept of intermediated settlement that is a "longstanding commercial practice" and "a method

of organizing human activity").

The Federal Circuit recently emphasized that the "directed to" inquiry is a "meaningful

one" that must go beyond "simply ask[ing] whether the claims *involve* a patent-ineligible concept."

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). In particular, the Federal

Circuit clarified that computer-related inventions are not inherently abstract, and therefore such

technologies are not necessarily analyzed only at the second step of the *Alice* framework. *Id*. at

1335–36. The Federal Circuit acknowledged, however, that "[i]dentifying the precise nature of

the abstract idea is not . . . straightforward." *DDR Holdings*, 773 F.3d at 1257. *Enfish* warns

against "describing the claims at such a high level of abstraction and untethered from the language

of the claims" that "all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822

F.3d at 1337.

Once it is determined what the claims are "directed to," the next inquiry is whether the

claims are directed to an abstract idea. Although there are no bright-line rules regarding whether

a particular idea is to be considered abstract as a matter of law, case law illustrates some common

themes. For example, the Supreme Court and Federal Circuit have found abstract ideas embodied

by claims directed to longstanding economic practices, abstractions having no tangible form, and

functions humans have always performed. *See Bilski*, 561 U.S. at 611 (finding claims directed to

"hedging" to be drawn to an abstract idea because it is a "fundamental economic practice long

prevalent in our system of commerce"); *Alice*, 134 S. Ct. at 2356 (finding claims directed to

"intermediated settlement" to be drawn to an abstract idea because it is a "longstanding commercial

practice" and "a method of organizing human activity," similar to *Bilski*); *Ultramercial, Inc. v.

Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (finding claims directed to "showing an

advertisement before delivering free content" to be drawn to an abstract idea because it is "an

abstraction—an idea, having no particular concrete or tangible form"); *Content Extraction &

Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding

claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and

3) storing that recognized data in a memory" to be drawn to an abstract idea because such functions

are "undisputedly well-known" and "humans have always performed these functions"); *buySAFE,

Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (finding claims directed to a "transaction

performance guaranty" to be drawn to an abstract idea because it is a concept "that is beyond

question of ancient lineage"); *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d

1314, 1324 (Fed. Cir. 2016) (finding claims directed to "anonymous loan shopping" to be drawn

to an abstract idea because it "could all be performed by humans without a computer"); and *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333 (Fed. Cir. 2015) (noting claims directed to "a method of verifying the validity of credit card transactions over the Internet" were patent-ineligible because the method steps could be performed "in the human mind or by a human using a pen and paper") (citing *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011)).

In computer-related technologies, the Federal Circuit recently clarified that a relevant question to ask even at the first step of the *Alice* analysis is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335–36. Such claims directed to an improvement in computer functionality can be contrasted with those that (1) "simply add[] conventional computer components to well-known business practices; (2) "use . . . an abstract mathematical formula on any general purpose computer;" (3) recite "a purely conventional computer implementation of a mathematical formula;" or (4) recite "generalized steps to be performed on a computer using conventional computer activity." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (citing *Enfish*, 822 F.3d at 1338) (collecting cases).

Against this backdrop, the court turns to the present action and Google's Motion for Judgment on the Pleadings. Google argues that the claims of the '608 and '302 patents are directed to the abstract idea of "translating . . . content and sharing the translated content . . . with or without advertisements." (D.I. 85 at 1.) Google alleges this concept "has been practiced in various forms throughout history," including translating books into different languages and sharing the translated books, translating video from a film real into a format for distribution (e.g., VHS or DVD) and

8

distributing the translated video, and the process whereby *America's Funniest Home Videos* translates VHS video tapes received from the public, translates them into a format for broadcast, and then broadcasts the translated video. (*Id.* at 5–9.)

In response, VideoShare derides Google's "directed to" formulation for omitting "core claimed features," resulting in a "fail[ure] to capture what the claims are directed to." (D.I. 107 at 1.) VideoShare alleges that the claims "are actually directed to systems and methods of sharing video over a computer network by automatically, upon receipt, converting video files to streaming video format and serving them via a webpage with identifying thumbnails generated from the video frame images." (*Id.*)

The court rejects both parties' formulations. On the one hand, Google's proposal risks running afoul of *Enfish*'s warning against "describing the claims at such a high level of abstraction [so as to be] untethered from the language of the claims." *See Enfish*, 822 F.3d at 1337. On the other hand, VideoShare's formulation is loaded with nearly every step or feature recited in the claims, thereby defeating the distillative purpose of the "directed to" inquiry. The court finds both the '608 and '302 patent claims are directed to preparing a video in streaming video format for sharing over a computer network. This formulation remains tethered to the claim language, while at the same time distilling the thrust of the claims to a basic concept consistent with the formulations adopted in Supreme Court and Federal Circuit decisions. *See, e.g., Alice*, 134 S. Ct. at 2356 (finding the claims directed to "intermediated settlement"); *Ultramercial*, 772 F.3d at 715 (finding the claims directed to "showing an advertisement before delivering free content"); *Content Extraction*, 776 F.3d at 1347 (finding the claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory," or more simply, "[t]he concept of data collection, recognition, and storage"); *In re TLI*

*Commc'ns*, 823 F.3d at 611 (finding the claims directed to "classifying and storing digital images in an organized manner"). The court's conclusion also finds basis in the '608 and '302 patent specifications, which disclose that the invention "relates to sharing video in streaming video format over a network . . . ." '608 patent at 1:20–21 and '302 patent at 1:18–19. Consideration of additional limitations provided by the claims is properly deferred to the second step of the *Alice* analysis.

Next, the court examines whether these claims are directed to an abstract idea. The court finds instructive the analysis of *TLI Communications*, in which the Federal Circuit found the asserted claims were directed to an abstract idea. 823 F.3d at 609. Representative claim 17 is set forth below:

> 17. A method for recording and administering digital images, comprising the steps of:
> recording images using a digital pick up unit in a telephone unit,
> storing the images recorded by the digital pick up unit in a digital form as digital images,
> transmitting data including at least the digital images and classification information to a server, wherein said classification information is prescribable by a user of the telephone unit for allocation to the digital images,
> receiving the data by the server,
> extracting classification information which characterizes the digital images from the received data, and
> storing the digital images in the server, said step of storing taking into consideration the classification information.

U.S. Patent No. 6,038,295 ("the '295 patent") at 10:1–17. The Federal Circuit found claim 17 to be directed to "the abstract idea of classifying and storing digital images in an organized manner." *In re TLI Commc'ns*, 823 F.3d at 611. The Federal Circuit observed that although the claims recite some tangible components, such as a "telephone unit" and a "server," the patent specification revealed that such components "merely provide a generic environment in which to carry out the abstract idea." *Id.* The Federal Circuit also determined that the claims are "not directed to a

specific improvement to computer functionality," but rather "are directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two." *Id*. at 612.

In expounding on this lack of an improvement to computer functionality, the Federal Circuit noted that the inventor was not faced with the problems of combining a camera and a cellular telephone, transmitting images via a cellular network, or associating the images with classification information.   *Id*.   Rather, "the inventor sought to 'provid[e] for recording, administration and archiving of digital images simply, fast and in such way that the information therefore may be easily tracked.'" *Id*. (quoting '295 patent at 1:62–65). The Federal Circuit further noted that the telephone, server, and other tangible components were not new and were described in the specification predominately in functional terms. *Id*.

Here, just as in *TLI Communications*, the claims are directed to an abstract idea because the claims are not directed to an improvement in computer functionality, and the physical components of the claim merely provide a generic environment for carrying out the abstract idea. In determining whether an improvement in computer functionality exists, it is useful to consider the problems solved by the claimed invention.   VideoShare argues that the claims address three problems with how conventional video files are transferred over computer networks:  1) although conventional methods to transfer such files required transmitting the entire file before it could be viewed, the present claims require conversion upon receipt to a format (i.e., streaming video format) that does not require complete transmission before viewing; 2) the claims address problems associated with using an alphanumeric string to identify a video by instead generating

and embedding a thumbnail; and 3) the claims overcome the burden of manually posting a link associated with a video to a web page by automating this process. (D.I. 107 at 13–14.)

The court is not persuaded that the claimed invention results in an improvement to computer functionality. VideoShare did not invent the technology that converts video files into streaming format. For example, the '608 patent discloses that proprietary VideoShare Producer software can be used to carry out the claimed invention, but this software is "built upon . . . third-party technologies that provide . . . file format conversion," including various Microsoft products. '608 patent at 19:38–43. The file format conversion is disclosed to be "generally algorithmic in nature." *Id.* at 14:42–46. Other than these generic disclosures, the specification does not disclose any specific algorithms or specific software code that carries out the file format conversion, nor do the claims recite the VideoShare software as part of the invention. Similarly, VideoShare did not invent thumbnails, the extraction of such thumbnails from video files, or the embedding of thumbnails. VideoShare admits this, and argues in response that "the inventive aspect of [the identification tag] limitations is not creating a thumbnail or adding a link to a webpage but rather using a webpage that includes identifying thumbnails to serve video files over a network." (D.I. 107 at 18.) But "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (internal quotations and alterations omitted). *See also Ultramercial*, 772 F.3d at 716 ("As we have held, the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101"). Moreover, VideoShare was not confronted with the problem of how to combine conversion technology and the Internet, or how to associate identification tags with video files.

At most, the claims merely automate a sequence of known steps using conventional technology so that a human is not burdened with various manual steps (D.I. 107 at 13–14), including (a) manually using a general purpose computer to convert a video file into streaming video format, (b) manually selecting a thumbnail image from the video file using a general purpose computer, and (c) manually embedding the selected thumbnail image in a web page using a general purpose computer. Indeed, the United States Patent Examiner allowed both the '608 and '302 patents because they recited such automation. *See* '608 patent, November 27, 2012 Office Action at 3–4 (noting a related patent "was allowed on the basis of claiming an automated system which would convert an uploaded file directly into a streaming format independent of any command to do so, which is a feature similarly claimed in the instant application"); '302 patent, March 21, 2013 Office Action at 4 ("The claims have been amended to recite a video distribution system with automated conversion to streaming format as similarly recited in the above allowed applications . . . .").

The ordered arrangement of such conventional features provides no discernable benefits to computer functionality. This stands in stark contrast to claims which achieved such improvements to computing technology. *See Enfish*, 822 F.3d at 1337 (finding increased flexibility, faster search times, and smaller memory requirements resulting from the claimed self-referential table); *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, No. 2015-1763, 2016 WL 3514158, at *7 (Fed. Cir. June 27, 2016) (finding the claimed arrangement for filtering content over the internet to be a technological improvement over prior art filters that were inflexible, susceptible to hacking, and dependent on local computer resources). Additionally, the physical components in the claims, such as the receiving computer, first computer, and web page, merely provide a generic

environment for carrying out the abstract idea of preparing a video in streaming video format for sharing over a computer network.

The court also notes strong parallels between the language of the claims asserted here and the patent-ineligible claims in *TLI Communications*. For example, the claims in *TLI Communications* recite, among other things, receiving digital images via a server, "extracting classification information which characterizes the digital images," and "storing the digital images in the server" with the classification information taken into consideration. *See* '295 patent, claim 17. These steps are strikingly similar to certain steps of claim 1 of both the '608 and '302 patents, which recite, among other things, receiving a video file via a computer, generating an identification tag that identifies the video, and embedding the identification tag into a web page. The "identification tag" of the instant claims is quite similar to the "classification information which characterizes the digital images." *See* '295 patent, claim 17. Notably, the court in *TLI Communications* stated that "attaching classification data, such as dates and times, to images for the purpose of storing those images in an organized manner is well-established 'basic concept' sufficient to fall under *Alice* step 1." *In re TLI Commc'ns*, 823 F.3d at 613. In the same way, attaching an identification tag, such as a video frame image, for the purpose of identifying the stored streaming video file is also a basic concept.

The court also notes similarities to *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015). In *Internet Patents*, the Federal Circuit found the claims were directed to the abstract idea of "retaining information in the navigation of online forms" because many of the claim limitations were disclosed in the specification to be "conventional" and the claims failed to recite a restriction on how the result was accomplished. *Id.* at 1348. The claims of the '608 and '302 patents similarly recite conventional features without a restriction on how the result is

accomplished. For example, claim 1 of both the '608 and '302 patents generically recite "converting the video file into a streaming video file," "generating an identification tag," and "embedding the identification tag . . . into a web page." But claim 1 of each patent does not specify *how* these tasks are completed, but rather merely specifies *what* is to happen. In looking to the specification to determine the "how," it is apparent that conventional computers are all that is needed to carry out the various steps, without any improved functionality resulting from the arrangement of such conventional computers or their functions. *See, e.g.*, '608 patent at 15:41–64 (disclosing the second computer to include "a personal computer of conventional type such as a desktop or laptop computer, a hand held device such as a PDA, or a more powerful computer such as a workstation, a server, a mini-computer, a mainframe, or the like").

In view of the foregoing reasons, the court concludes the claims of the '608 and '302 patents are directed to an abstract idea— the abstract idea of preparing a video in streaming video format for sharing over a computer network.[4] The court proceeds to step two of the *Alice* inquiry.

## 2. <u>Inventive Concept</u>

Not all patents directed to abstract ideas are patent ineligible under § 101. Therefore, although the '608 and '302 patents recite an abstract idea, they will not be found invalid if there is evidence of an inventive concept or contribution: "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355. But drawing a line between patent-eligible and patent-ineligible manifestations of abstract ideas is often difficult. *See DDR Holdings*,

---

[4] In some cases, "there may be close calls about how to characterize what the claims are directed to." *Enfish*, 822 F.3d at 1339. *See also Bascom*, 2016 WL 3514158, at *5 (finding the case before it to be one of these "close calls"). In such cases, when "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea, . . . consideration of the specific claim limitations' narrowing effect [may be deferred to] step two." *Id.* Even if the present case represents one of those "close calls," the court properly continues to step two of *Alice*.

773 F.3d at 1255. The recitation of "well-understood, routine, conventional activities," previously known to the industry, however, is insufficient to "transform the claimed abstract idea into a patent-eligible application." *OIP Techs.*, 788 F.3d at 1363 (internal alteration and quotation marks omitted) (quoting *Alice*, 134 S. Ct. at 2359). In determining whether the claims possess an inventive concept, the elements of a claim must be considered both individually and as an ordered combination. *Alice*, 134 S. Ct. at 2355.

Google contends that the claims do not possess an inventive concept because the claims merely implement an abstract idea using generic computing technology to "perform well-known, routine, and conventional activities." *See Content Extraction*, 776 F.3d at 1348. Google walks through the conventional nature of the various individual features of the claims—including the recited computer functions, Internet functions, conversion to streaming video format, generation/embedding of the identification tag, and association of an advertisement—supporting its argument with the specifications and case law. (D.I. 85 at 11–17.) Google also contends that the ordered combination of these features is not inventive because "the components of each claim add nothing that is not already present when the steps are considered separately." (*Id.* at 17–18) (citing *Versata*, 793 F.3d at 1334).

VideoShare responds by contending that Google has failed to meet its burden to prove that the additional features recited in the claim are more than well-understood, routine, and conventional activity. (D.I. 107 at 15.) Rather than demonstrating *why* the claim limitations are *not* well-understood, routine, and conventional, VideoShare merely makes conclusory statements to this effect without explanation. (*Id.* at 16.) Citing *DDR Holdings*, VideoShare argues that the claims are patent-eligible because the claims are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" and the

claims "solve technological problems by overriding the routine and conventional uses of computer technology." (D.I. 107 at 12–13 (internal quotation marks omitted).) Specifically, VideoShare argues that the claims solve problems created by using technology in its routine and expected manner. (*Id.* at 12–13.) In this regard, routine methods of sharing video required transmitting files completely before the file could be accessed, using alphanumeric strings that are not "readily recognizable" to identify files posted on a web page, and posting a file on a web page by manually generating a link to it and manually adding the link to a web page. (*Id.* at 13.) VideoShare submits that such routine and conventional methods were "overridden" by the claimed method of automatic conversion and processing of a file upon receipt to streaming video format with an associated thumbnail image. (*Id.* at 13–14.)

The court agrees with Google that the limitations of the claims of the '608 and '302 patents, when considered both individually and as an ordered combination, do not contain an inventive concept and thus fail to transform the abstract idea into patent eligible subject matter. Significantly, as already discussed, the claims do not result in an improvement in computer functionality. Moreover, the claims merely recite conventional computer components or functions that involve the use of a computer network, such as the Internet. For example, the claims recite a "receiving computer," "second computer," "converting," "generating," "embedding," "transmitting," "network," "web page," and "storage device." The specification discloses the "receiving computer" to have the capabilities of "receiving the transmission of a video file . . . [via] e-mail, HTML message, Web page format, or FTP upload, . . . extracting from the received message the video and all information sent with the video, . . . determining whether the video is already in a format compatible with streaming video, . . . storing a copy of the video in video format in an archival machine-readable storage, . . . recording in a database . . . the identification

tag and the storage location [of the video], . . . and serving the video in streaming video format." '608 patent at 9:50–10:51. The "second computer," which is the computer on which a user can submit a video and access a streaming video, can include "a personal computer of conventional type such as a desktop or laptop computer, a hand held device such as a PDA, or a more powerful computer such as a workstation, a server, a mini-computer, a mainframe, or the like." *Id.* at 15:41–64. The network can be the Internet. *Id.* at 1:58.

All of the aforementioned computers, capabilities, and functions are well-understood, routine, and conventional activities, and the claims fail to recite any features that go beyond such conventional activities. *See In re TLI Commc'ns*, 823 F.3d at 613 (examining the specification for meaning of claim terms such as "telephone unit," "server," "image analysis unit," and "control unit," and concluding that all of the components "behave exactly as expected according to their ordinary use."). For example, at the time of the invention, general purpose computers regularly received transmissions, extracted information from messages, determined file formats, stored files in memory, and provided files to be accessed over a network. Additionally, considering the individual features of the claim as an ordered combination does nothing to provide an inventive concept. *See Versata*, 793 F.3d at 1334 ("[T]he components of each claim add nothing that is not already present when the steps are considered separately.").

The claims here specify only conventional steps at a high level of generality, and the association of an advertisement is not sufficient to provide an inventive concept. *See Ultramercial*, 772 F.3d at 715 (finding no inventive concept in an eleven step method, which included a step of "selecting a sponsor message to be associated with the media product," because the claimed method "comprise[ed] only conventional steps specified at a high level of generality.") (internal quotations omitted). Furthermore, limiting the claims to a particular technological environment,

18

such as computer networks or a web page, does not provide an inventive concept. *See Internet Patents*, 790 F.3d at 1348–49 ("siting the ineligible concept in a particular technological environment" was not sufficient to provide an inventive concept); *Content Extraction,* 776 F.3d at 1348 ("At most . . . [the] claims attempt to limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment . . . [which] has been held insufficient to save a claim in this context"). Additionally, as discussed above, the claims merely automate what a person could do manually with a general purpose computer. But automation also cannot save the claims from patent-ineligibility. *See OIP Techs.*, 788 F.3d at 1363 ("At best, the claims describe the automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions. . . . But relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

Notwithstanding VideoShare's arguments to the contrary, the claims of the '608 and '302 patents are also distinguishable from *DDR Holdings*. The invention in *DDR Holdings* "address[ed] the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on [a third-party's] advertisement . . . ." 773 F.3d at 1257. When clicking on this advertisement, instead of transporting the user to a third party webpage, the patent claims instead called for directing the user to an "automatically-generated hybrid webpage that combines visual 'look and feel' elements from the host website and product information from the third-party webpage." *Id.* The claims were "necessarily rooted in computer technology" and specified "how interactions with the Internet are manipulated to yield a desired result . . . that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id* at 1258.

In contrast, as Google notes, the instant claims "merely use conventional computer and Internet functions to implement the abstract idea," rather than "address[ing] any Internet-centric technical challenge." (D.I. 85 at 18–19.) The instant claims require a series of conventional steps that could be done on a general purpose computer by a human to instead be done in an automated fashion on a receiving computer via the Internet. In this regard, manually following the claimed conventional steps does not lead to an unconventional result, and, as discussed above, automation of these conventional steps does not save the patents from ineligibility. In this way, unlike *DDR Holdings*, the instant claims do nothing more than conform to the routine and conventional.

None of the dependent claims in either the '608 or '302 patents adds anything that would free those claims from the domain of abstraction. Specifically, the dependent claims recite additional conventional features, such as "upload form," "wireless networking connection," "URL," and "plurality of computing devices," that do not render the claims non-abstract when considered alone or as an ordered combination. VideoShare makes no attempt to identify any inventive concepts in the dependent claims. (D.I. 107 at 18–19.)

## V.      CONCLUSION

The court concludes that the asserted claims of the '608 and '302 patents are not eligible for patent protection under 35 U.S.C. § 101. The court will grant Google's Motion for Judgment on the Pleadings. (D.I. 84.)

Dated: August 2__, 2016

UNITED STATES DISTRICT COURT